And now, we will have your argument in Dantas group. Or Dantas v. Citigroup, sorry. May it please the Court, Philip Korologos with Boies, Schiller, Flexner for the Plaintiff Appellants. It is a fundamental principle that a release cannot prevent claims that allege defects in the formation of the contract containing that release. Put simply, a release cannot be self-insulating and is only enforceable if knowingly and voluntarily entered into. The District Court did not properly apply this principle, and the ruling below, if allowed to stand, would create the wrong incentives in negotiations for contracts generally and of settlement agreements specifically. This fundamental principle informs how the release in this case should be applied and how the carve-out should be interpreted to favor this principle, not to undermine it. Both common sense and this principle show that the release cannot be self-sealing and that the carve-out must allow claims challenging the validity of the agreement. Are you saying that there was duress here which invalidates the release and the whole settlement? There was duress, Your Honor. And does it invalidate the contract? It makes it voidable, and not that it's void ab initio or simply void, but it's voidable. All right. Do you agree that's different from the tort of duress? Well, I think they are tied up when the duress is in the context of achieving a release. Maybe tied up, but are they different? I believe that they would be, Your Honor. In terms of a challenge to the agreement and— Which are you claiming? We've got the tort, Your Honor. The tort? Yes. Not the quasi-contract? It's the tort. Only? Well, it's the tort that's tied up with the contract in this instance. For instance, I believe it's the Phillips case. Tied up I don't think is a very useful legal concept. There are two doctrines. One is tort, one is quasi-contract, right? Yes, Your Honor. And I'm trying to understand which are you pursuing, or are you trying to pursue both? Well, I think at this point I'd argue in the alternative that it's either. But in terms of the tort— All right. Well, let's take it. Can we talk about them one at a time then? To the extent it's quasi-contract, did you ratify afterwards? Well, we're not seeking rescission. And in terms of— More than that. Didn't you benefit from the settlement?  All right. We have ratified, Your Honor. All right. So then any quasi-contract claim is gone, right? Because you ratified it. Well, it's probably covered by the contract. When there's a contract claim, you can't usually have a quasi-contract claim. But you're not trying to undo the contract, right? We are not trying to undo it. We are living with the contract. So then when you said pleading in the alternative, you're really only talking about the tort of duress. Is that right? Principally, Your Honor, yes. So when you said I'm pleading in the alternative or arguing in the alternative, one prong of the alternative is just not here, right? Well, probably. I think that gets back to the issue of arising out of. Either it's a claim you're making and we'll pursue it, or it's a claim you're not making and we can forget it. So it probably doesn't help. The claim we are pursuing, Your Honor, is the tort. Is the tort. Tort of duress in achieving the settlement. The question, as I understand it, is whether it's based on pre-settlement actions. Do you want to talk about that? Well, in terms of coverage of the release, Your Honor, I think there is a clear issue as to whether the duress is covered by the language of the release itself. The argument, as I understood it, as to the tort is that the actions you complain about occurred prior to the release. For the tort of duress, that's correct. And not just prior, though. It's prior to and at the time of the. If it occurred prior to the release, why doesn't the release extinguish any liability for that tort? Two reasons. One, the fundamental principle that a release cannot be self-sealing. That a release should not permit a wrongdoer to put into the release language that absolves it of its wrongdoing. That's what this Court addressed in Turkish. Can we say that the release cannot absolve the wrongdoer of its wrong? A party that engages in duress or in fraudulent inducement to achieve an agreement, and Turkish was a fraudulent inducement case. Ours is a duress case. As the Second Circuit said in Turkish, we could not uphold any provision intended to insulate parties from their own fraud. The same should be true with duress. A party engaging in duress should not be able to put a gun to my head and say, put into the contract an agreement that lets me get away with my gun to your head. And as a result, that's what I mean by self-sealing. It cannot be self-protected from the release. And just like in Slotkin, where the Court said you can pursue a claim for rescission or you can pursue a claim for damages. Now, why? For the very same reasons. As Slotkin quoted McCormick on contracts, if the cheat can anticipate that the worst that can happen is that he shall be called upon to pay back his profit upon the trade, he may be encouraged to defraud. This is all the more applicable in the context of duress, where it's by force rather than by deception. The incentives need to be that the parties can challenge an agreement that was procured by duress. Second reason. Now it sounds like you're back to your contract claim when you say can challenge an agreement. That's not a tort. That's quasi-contract. The challenge, Your Honor, is a duress claim. The defense is that there is a release. And just like in Slotkin, because the release was invalidly obtained, the issue is can you get additional damages above that? So the concept for the tort. Here's what happened in Slotkin. In Slotkin, there was a settlement of a case for $185,000, a medical malpractice case. And at the time of the settlement, the representation by the hospital was they only had $200,000 of insurance. Went through trial, end of trial. Before a jury comes back, they decide to settle for $185,000. Then it turns out they had a million dollars of additional coverage. And what the plaintiffs did in Slotkin was they brought a claim for damages over and above the $185,000. They got $680,000. That's the additional damages. They get to keep the $185,000, which is the ratification issue, just like in here, in this case. They got to keep the $185,000 and pursue the damages for the amount of harm caused because of the fraud in that case. Pardon me? The fraud, if you will, or the deception by the hospital that it only had $200,000 in coverage and really had a million dollar policy backing that up as overage or whatever it was, was something discovered after the release and that had been entered and the case had been settled. Here, the duress was obvious from the get-go. It was, Your Honor, but the same principle about validity of the contract should apply all the more in the context of our case where there's a gun to our head not only to enter into the release but to not challenge it. So the duress is continuing through this whole period. And I see my time is running out. One related issue to this. The release in this case is for conduct prior to the date of the settlement. Necessarily, the duress here is entering into the settlement on the date of the settlement. Aren't those facts necessarily before the entering into the release? Well, I think it is. The gun isn't at the head, to follow up on Judge Chin's point. The gun isn't at the head. It stays at the head all the way through the signing, so it starts somewhere prior. It does start prior, but then it continues on. The plaintiffs were involved in litigation. The plaintiffs had counsel. And you're saying the gun was put to the plaintiff's head while they're represented by counsel, and yet they still succumb to all this? We have lengthy allegations with respect to this, Your Honor. Even the court below recognized the gun to the head. The point of a release is to release the claims based on actions that take place before. It is, which is one of the reasons why we have a separate issue we haven't addressed yet with respect to malicious prosecution, which necessarily accrues afterwards because the claims cannot accrue until the charges are brought. But with respect to release . . . Because it seems to me these are all acts or omissions that occurred prior to the date of the agreement. Your clients knew of them, and yet your clients, with the advice of counsel, entered into this release agreement. The fundamental point, I believe, Your Honor, is that even assuming that the release covers the conduct that led to the agreement as a matter of language, the release should not be applied to allow Citibank, in this case, to get away with that duress. And therefore, the release should be set aside, even if the carve-out language, which I believe under the Phillips case, and the definition of arising under, clearly applies in this instance so that these claims are not actually covered by the release. They're covered as prior, but not because they arise out of the settlement. I think the metaphor may be getting in the way, at least of my understanding. I follow you if somebody is at a discussion about settling a case, and one party puts a gun to his head and says, unless you sign this document, I'm going to kill you. And so he signs it under duress. I can see serious problems with the validity of that signing. But if a year before he says, I'm going to use very heavy power against you during the next year, maybe even shoot somebody somewhere during the year, and then a year goes by and they say, let's be friends and settle everything, I don't understand how the gun to the head carries through to the moment of signing. That's not this case. Well, I thought you said it carried through. I thought that was your argument. I'm saying the first part of there being threats of using force, and then we get together and resolve that. That's not this case. This case is the government of Brazil wants to settle an action in order to allow this massive telephone transaction, super tele-transaction to go forward. In order to do that, they've got to deliver a clear company. We tried to preserve our claims against Citibank. At first, we got some traction with that, with the parties involved, including the government. They said, okay. Then what did we do? We drafted the settlement of the parties that the government forced us to settle, which was the pension funds. We drafted that as a covenant not to sue rather than a release. Then Citibank got upset with that because that, under contribution laws in Brazil, preserved the right to go after Citibank for the entirety of the damages that had been caused through all of this effort before. So we sought to preserve that. Then the gun comes out and says, no, you have to solve or you have to resolve your claims against Citibank. You have to give those up. So the gun is not a gun that is part of the party's fight that then gets resolved in a settlement. The gun is to resolve the settlement, to achieve it. And then the gun stays to prevent a challenge to that afterwards. At the moment of signing, is that your argument? Yes, Your Honor. At the moment of signing. At the moment of signing, my client is under duress. They would not have signed on April 25, 2008 if they had not been under the threat of prosecution. And then they got prosecuted anyway. Falsely. Before you step down, let me just raise one other issue. We'll give you more time, Mr. Bacuzzi, so don't worry about that. Is it clear that, or are we in agreement, I believe we are, that it's the law of the state of New York that applies to the claims here? Applies to the analysis of the claims? For purposes of this court, I think we are all in agreement with that. The distinction between New York law and Brazilian law, I think, is primarily with respect to the damage you can get. There's this concept in Brazil called lost chance. We reserve the right to use Brazilian law, assuming we can get back to the district court on this. But for purposes of this analysis, I think these issues, there's no distinction between New York and Brazil. Has the New York Court of Appeals made it clear that there is such a thing as the tort of duress? Well, in the Bennett case out of the Eastern District of New York, Your Honor, there's an analysis with respect to that. It's a rare circumstance that the federal court actually tells the state of New York what its law is. It is. We may analyze it. But there's also the principle that one can look to other cases in the state to see what the court would do. And what it did there was look to the coercion concept. We're all familiar with that. My question was, or do you remember my question? I do, Your Honor. And the answer to that question is? I think it has, but the claim didn't get sort of affirmed. And that's in the 805 Third Avenue case where it recognized the concept of a duress claim, and that was an economic duress claim. But then it found for other reasons that the claim could not be pursued in that case. Okay. So dictum at best. Dictum, but I think the kind of indication. And if the court feels it's not clear, we obviously can go ask the Court of Appeals. Thank you. And you've reserved two minutes for rebuttal. Thank you very much. Yes. Mr. Pucuzzi. Thank you, Your Honor. May it please the Court. Carmine Pucuzzi for? Victor, why don't you start with, I don't know, 12 minutes at least for him, please. Thank you, Your Honor. So the red light doesn't come on too soon. It never saves you anyway, so go ahead. It's true. Thank you. For the appellees, the district court was correct when it applied the plain language of the 2008 Comprehensive Settlement and Release Agreement in finding that both the duress claims and the malicious prosecution claims were barred under that release. It's common ground that the duress claim would be reached by the scope of 2.1b. Counsel's argument against it is twofold. Number one, that it falls within the carve-out of 2.1c, and then the arguments that he was just making about no self-sealing documents. Just to take those in order, 2.1c is, as one would expect of a carve-out, narrower than 2.1b. It's narrower both in terms of the substance that it reaches. There are 13 broadly listed items that are the factual matters that are released by the parties in the release. 2.1c deals only with the settlement agreement, and it specifically carves out claims arising out of or for breach of the settlement agreement, whereas the scope of the release refers to anything that arises out of, is based on, or relates to the 13 subject matters that are in the release. So we're already dealing with a much narrower provision, and arising out of or for breach of, you read those terms together, and it's clear that's meant to cover disputes where the parties disagree what the agreement provides for, if the parties have an argument over if someone is performing under the release and settlement agreement. That's not what's involved here, obviously. Here, they're just making arguments based on pre-agreement conduct, and the release is broad in talking about any and all claims, acts or omissions of Citibank and other parties that predated the agreement, and from that it's trying to cobble together this duress claim. And so that plain language analysis means this claim was released. If you also look at the Corregus decision of this Court, which talks about arising out of, it talks about it being narrower than if you have terms like related to or in connection with, and it also talks about a causative element. Their duress claim was not caused by the settlement agreement. Their duress claim was caused by the proverbial, the metaphor, gun to the head that he said existed on his client, who, by the way, was represented by Boy Schiller, on his billionaire client, leading up to the signing of the settlement agreement. So the carve-out doesn't take this duress agreement, as the district court found, and very carefully parsing this language, and I'll get to that in a second. The issue about self-sealing, the district court also dealt with this as well. It is black-letter law that even, I guess, if you and I had an agreement that said I give up my duress claim, but I was literally looking down the barrel of a gun as I signed that, I'd be able to challenge that. But that challenge comes in the context of my saying, going to court and saying, rescind this. There is no meeting of the minds here. I was under duress, which is literally I had no free will. There is no contract here. There is no New York case, Judge Hall, that has a situation where a party, sophisticated party, advised by counsel, signs a settlement document, has benefits under it. His client got releases under this. He's not seeking to challenge that. His client got monetary compensation. He's not looking to challenge that. So ratifies it and then goes to court and asks for more. It is a classic heads I win, tails I lose kind of argument that doesn't find any support in New York law or, for that matter, Brazil law, which is briefed below as well, but right now everyone is talking about New York law, which clearly applies here. I understand him, and I may not. I thought his argument, well, first, we're limited to the tort. We've got that established. We're not talking about quasi-contract. We're just talking about the tort of duress. If that's the case? Well, that's what he said. First he said it's in the alternative, but then it seemed to me he abandoned the contract one. When I asked him specifically, is it just the tort, he said yes. And it's released. So let's talk about the tort. Okay. Do you agree that there can be a tort of duress where the duress continues right up until the instant the settlement is signed? That sounds like it could happen, correct? It can happen. Yes. And when I asked him about that, his argument is that is this case. He thinks the duress continued up to and including the moment of signing. Now, he may be extending the facts a bit, but to the extent that's a legal argument, that's a good legal argument, isn't it? That such a thing exists? That is correct, but it doesn't help him here because then it's released. No. Well, to go back to this awful metaphor, if the gun is at the head at the moment of signing, that signed document is invalid. Is that correct? Or at least voidable? But now we've slopped into the quasi-contract theory. So we see the tort. No, no, no, no, because he's not claiming the contract. He wants money for the tort of duress.  All claims for conduct leading up to it. So if there was a gun to the head, then he would need to say, and this is the contract side of it, you can't hold me to that release. There was a gun to my head. But your claim on the tort was that the actions constituting the duress occurred prior to the signing of the release. Correct. So that's not duress at the moment of release. Oh, but prior. No, it's the same thing. There's no nanosecond escape hatch that I was under duress, and then the gun to the head, to use the metaphor, is sort of the gun pointed throughout. My hypothetical that I started with — Do you agree that duress continued up to the moment of the signing? That's his allegation. Do you agree to that? That's not true. Oh, well, that's what I'm trying to get at. Did it end earlier? Yes. Yes. Not end by virtue of the release, but ended factually. It did end factually. I don't think it existed ever, but if we're going to even accept this argument in terms of what he plausibly pled, here the parties were in three years of intensive litigation before the district court. There were 24 decisions issued by the district court. Eleven of them were injunctions or restraining orders, restraining his client from violating their fiduciary duties to my client. The district court, which actually said, I cannot be the district court for the injunction and enjoining of Daniel Dauntess, urged the parties to settle. We were in settlement discussions in 2008. We were writing to the court that we were in settlement discussions through 2008. They got extensions of their obligation to respond to our motions to compel because we were all in settlement negotiations in the shadow of the courthouse, and then we settled. So given those facts that are either referenced in the complaint or judicially noticeable by this court, there was no duress at the signing of the document. Did the district court make a finding that the alleged duress ended prior to the signing of the settlement? What the district court did was say that this theory was not cognizable, given that you had an acceptance and a ratification of the document by the acts of the plaintiffs here. That answers a different argument. That answers a quasi-contract claim. I'm not sure below they explicitly argued the tort. And even in the back and forth, Your Honor, that you had with counsel, it's this constant mushiness between we're challenging, we can keep the release in the agreement and sue for more. So I don't think it was bucketed as the contract versus the tort. What was clear to everyone was that they were trying to use this theory to undermine the release that otherwise applied, and that they couldn't do it. We also argued that there is no plausible allegation. Whether the judge made a finding or not, is your point, or one of your points, that this record supports our looking at it and saying it is undisputed that the duress ended before the signing? I don't think they're going to agree it's undisputed, but is it your point? Just on Judge Newman's point, aren't we at a 12B6 proceeding? You're in a 12B6 proceeding. So the judge, the district court below, isn't making any findings, period, end of story, except what he divines from what's alleged in the complaint. Right, he was reading the complaint and the judicially noticeable documents like this. As to, in answer to Judge Newman's question, what it is that says, that we will be able to look at that says the duress ended because they pleaded it that way. You would look at their allegations, which by and large are about things the Brazilian government did, and everything is attributed to Citibank, which is just wrong as a matter of pleading, and it's not sustainable under Twombly and Iqbal. You would note that they say that the party settled, and then you would look at the other documents that are judicially noticeable on this motion to dismiss, the settlement agreement, the fact that they were represented by counsel, the fact that the court was informed of what was going on, and the fact that there is no allegation of actual gun to the head during the settlement negotiations. The one thing they mention is a statement by the lawyer from Citibank in negotiations saying, you know, the government might step in. That's not duress. That's not the government or, I'm sorry, Citibank putting a gun to anybody's head. And I would note in the CBS refuse case in New York, that was a case that there was no litigation. The parties entered into an agreement, and the court noted, you were in negotiations. You could have come to the court. There was no court on the scene. Here we were embroiled in this litigation before the district court, writing to the district court, and there was not a peep out of anyone of any sort of duress or difficulty or helpless, Your Honor. So you could say, based on that and what's not in the complaint, that there is no duress pled as at the time of the signing of this document in April 2008. Does New York recognize duress as a tort? I mean, there seem to be lots of cases saying that it's not recognized under New York. There may be. It's not clear because of the, I think Judge Newman helpfully framed it as in the land of quasi-contract or the land of tort. Certainly in the land of contract and people trying to get out from under a document, it's more discussed as an affirmative defense. Or if you're going to court, you're explicitly something that you haven't ratified, and you're seeking to rescind the document. On the tort side of it, it seems logical, but I don't know the case that tees this up perfectly, that says you would essentially be going in and saying, this person harmed me and took some money. I need my money back. And so thought of in that way, almost like a conversion claim, I guess they recognize that. But that's not this case. What this case is, is an attempt to get out from under a release with a party ratifying the document that is contained in the release. There's nothing like that in the case law. What could you address malicious prosecution? I mean, there are some post-release, significant post-release events. I would say on the post-release events, there's nothing significant as to Citibank. If you look at paragraph 298, so let me just take a state back. His prosecution, which is alleged to have occurred in July 2008, he claims was the result of pressure on a prosecutor. Citibank, what they're accused of doing is some 27 months earlier, they supposedly had a hand in altering a report by a panel of a congressional committee in Brazil, the so-called altered mens alaure report. And supposedly, we took out a reference to a put agreement, which was an issue, it's just a contractual matter that was hotly and heavily litigated in the IEII action that we settled. And also, there are allegations about Mr. Dantas being engaged in money laundering and misuse of funds while controlling Brazil Telecom. Nothing happened. Interestingly, and I think significantly, in April 2006, when this was brought to the attention of Judge Kaplan, plaintiffs admitted that this congressional panel, quote, does not even have the power to recommend an indictment in Brazil. So it's kind of this very to-the-side allegation about what Citi did vis-a-vis any prosecutorial powers in Brazil. Flash forward, we settle in April 2008, and then in July 2008, there's an allegation in the complaint that individuals at Brazil Telecom, not Citibank, individuals at Brazil Telecom urged the prosecutor to bring claims or charges against Mr. Dantas. So all the allegations or the few allegations against Citi predate the settlement agreement, and so are released pursuant to that. The settlement agreement importantly stresses and points to conduct or omissions predating the signing of the settlement agreement, so that would certainly cover this, and also otherwise talks about claims that are known or unknown, asserted or unasserted. So if you add those together and you look at the Scleuth case from the First Department, which notes that in that case unaccrued claims were covered by a release, even though the terms unaccrued was not used, these claims are clearly covered, or this claim is clearly covered. There's no magic words requirement in New York law that if you're going to reach unaccrued claims, you have to literally use that word. The important thing is you read the contract, you put it all together, you apply it to what's before you, and here I think the malicious prosecution would fall just as the district court found it would fall. If there are any doubts about it, I would just point to our argument, which we raised below, but the court didn't reach, which is that it fails to state a claim as a matter of 12b-6. There's a requirement of initiation in the malicious prosecution tort. There's no allegation that we initiated a prosecution. It's not enough to provide information to a charging authority, which we didn't even do. We just, according to the complaint, had input into this congressional panel report, which had no prosecutorial power, as they admit, and then 27 months later there was a prosecution brought against his client. So they failed to make out as a substantive matter the tort, a malicious prosecution. They also failed to plead, other than just saying the element of the tort, that we acted with malice or that there was no probable cause for what happened to Mr. Dantas. So that claim fails as well. I just want to note the policy matter. It's very important, both as a matter of federal courts and state courts, the policy in favor of settlement. I held up this binder before. Twenty-four decisions of the lower court, one by this court, 11 injunctions against his client to prevent him from violating his fiduciary obligations to my client, a hard-fought litigation, three years in the district court, a settlement reach advised by sophisticated counsel, everyone who's at this table right here, under the umbrella of the district court, who was kept informed. To reopen that nine years later in the context of someone who's otherwise accepted the benefits of the settlement would really open the door to all sorts of problems and has no basis in law and I really think as an institutional matter raises grave concerns. Thank you. Mr. Carlogos, you've reserved two minutes. Thank you. First, as Judge Hall noted, we are here on a 12b-6. A lot of arguments of facts here. What matters is what the allegations of the complaint are. The well-pleaded allegations with respect to Judge Newman's issue of was there the proverbial gun to the head at the time of signing. I refer to pages 48 through 66 of the complaint, which should be about pages 50 of the confidential appendix through 69. Those lead up to paragraph 196. Mr. Dantas, Mr. Furman, and Opportunity recognized that if they did not capitulate to the Citibank demands that the PT regime demanded in connection with the Supertel transaction, and remember those demands are to give the release to Citibank, the regime would bring to bear against them the full power and authority of the Brazilian state acting in derogation of the law. Two paragraphs later, paragraph 198, given this duress as described in all these preceding paragraphs, Mr. Dantas, Mr. Furman, and Opportunity had no alternative but to provide the release to Citibank and grant Citibank the rights in the High Lake proceeds that it required in order to avoid catastrophic harm. That only occurred at the signing. So it's clearly clear up to that. You were counseled at the signing? There was Brazilian counsel involved. We were involved in the transaction as well, Your Honor. Well, were they involved? I mean, were you there? It was signed in Brazil. Oh, were you in touch with your client? I was in touch with my client. Did you tell him not to sign? I did not. Did you tell him to sign? Given the issues that they were involved in, they made the decision that they had no choice but to sign this, and as we allege in the complaint, they had no ability to go to the Brazilian courts or to the New York courts to address that, given the threats that were made against them, which are highly detailed in the complaint. With respect to Citibank's involvement in that, I refer, Your Honor, to pages 8 to 9 of our opening brief, which identify several of those aspects. I may have a few moments to adjust. Did you know about those threats? Pardon me? All threats? I did not know at the time of the signing of the extent of the threats, Your Honor. Oh, not the extent, but you knew about them? I had been told generally by my client that they had no choice, that they had to do this. Go ahead and sign. We're going to beat them on a duress claim years later. I'm not going to reveal my privileged communications with my client, Your Honor. Well, I'm not asking what you told them. I don't want to know what you told them or what they told you. I want to know your legal view of the matter at that moment. Well, my legal view is similar to the Slotkin case, that based on what the issues are leading to the validity of the release, what can you do? And as the Slotkin court, which was this court in 1979, 40 years ago, said, the law of New York is clear that one who has been induced by fraudulent misrepresentation to settle a claim may recover damages without rescinding the settlement. You've got the choice. You can rescind if you can. You can go for damages under the tort. In terms of some of the rescission issues that Citibank has raised, I refer the court to that same page of Slotkin, which is page 312 of the 614 Federal Reporter II. In terms of malicious prosecution, it's not accurate to describe the complaint as not having anything to do with Citibank after the settlement is reached. For instance, in the fall of 2008, when the original arrest was floundering, Citibank's representatives, both through Brazil Telecom but otherwise, worked directly with the chief inspector of police. I believe that's paragraph 226 of our complaint. That occurs after July when they're trying to redo the Satyagraha claims to build them back up. And I refer the court to the Morehouse decision, which clearly shows that such a statement of wrongdoing to a prosecutor is sufficient. That's the first Department of New York case in 2014 where it states, a person can also be said to have initiated a criminal proceeding by knowingly providing false evidence to law enforcement authorities or withholding critical evidence that might affect law enforcement's determination to make an arrest. So just the fact that they created the lie 27 months earlier, which, to my friend's description of the complaints and issues or the claims by Judge Kaplan, shows where Judge Kaplan was deceived, at least with respect to this very false document that was put in front of him, that providing that lie 27 months later is still well within Morehouse and therefore sufficient for a malicious prosecution plan. Thank you, Mr. Carlogos. Thank you. Thank you both. We'll reserve decision in this case.